Argued and submitted June 28, reversed October 19, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*
*and*

CITY OF LAKE OSWEGO,
*Plaintiff,*

*v.*

BARBARA JAY REYNOLDS,
*Defendant-Appellant.*

Lake Oswego Municipal Court
08M94496; A142686

265 P3d 22

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erika L. Hadlock, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

**NAKAMOTO, J.**

Defendant appeals a judgment of conviction for second-degree theft, ORS 164.045. She assigns error to the trial court's denial of her motion for a judgment of acquittal, arguing that the state failed to prove the necessary element that she intended to defraud her landlord when she failed to pay rent. Because we agree with defendant, we reverse.

We review challenges to the sufficiency of evidence to determine whether, viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). We begin with a recitation, in chronological order, of each month's rental accounting.

On May 7, 2007, defendant and her husband entered into a one-year residential lease with Arant, to rent his condominium in Lake Oswego. The lease provided that monthly rent was $1,095 and required a $1,595 total deposit that included a $500 security deposit and $1,095 for the last month's rent. Because defendant lacked sufficient funds to pay the $1,595 deposit, the lease provided that defendant would pay an additional $400 in June, July, and August and $395 in September to account for the total deposit. The lease also provided that rent would be due on the first of the month and the landlord would charge a $10 per day late fee for any amount overdue after the fifth of the month.

On July 6, 2007, defendant first became late on her rent. Arant notified defendant's husband of the late rent and imposed a late fee. On July 12, 2007, defendant paid Arant for July rent, but did not pay the deposit amount or late fee.

On August 18, 2007, Arant sent defendant's husband an e-mail notifying him that the August rent was late and Arant would assess a $75 late fee. A few days later, defendant paid the August rent but not the late fee or the deposit.

On September 14, 2007, Arant sent defendant's husband an e-mail informing him that September rent was late

and defendant still owed late fees for July and August as well as the $1,595 deposit.

On October 18, 2007, Arant informed defendant's husband that defendant's October rent check had been returned for insufficient funds. Also around this time, defendant's husband lost his job and began to collect unemployment benefits.

On November 6, 2007, Arant received a money order for $1,095 for the October rent, but did not receive any money for the deposit or late fee. On November 7, 2007, Arant sent defendant's husband an e-mail notifying defendant that November rent was now due. On November 15, 2007, Arant received defendant's November rent, but no late fees or deposit amount.

On December 1, 2007, Arant sent an e-mail listing the outstanding late fees, bank fee for the dishonored check, and deposit. Defendant's husband told Arant that he would start paying the late fees off and sent a $200 check for the late payments and a $1,095 check for December rent. The $200 check cleared but the $1,095 December rent check was returned for insufficient funds.[1]

On January 9, 2008, Arant notified defendant's husband that his December rent check had been returned for insufficient funds. Arant also told defendant that December and January rent was now late and that he would take action to evict if defendant did not come current on her account. On January 15, 2008, defendant and her husband paid Arant $450 cash and said they "would do [their] best to get on track as quickly as possible." Around this time, the relationship between defendant and Arant became combative. Arant sent requests that defendant work out a plan to pay past due debts, but defendant's husband refused.

Defendant made further rent payments and some payments toward the balance owed. On February 1, 2008, defendant paid Arant $1,095 for February rent. On February 29, 2008, defendant paid Arant $800. On March 17, 2008,

---

[1] The December rent check was drawn from defendant's husband's account, not defendant's checking account.

defendant paid Arant $1,450. On April 5, 2008, defendant paid Arant $1,095. In early April, Arant posted an eviction notice. Defendant responded by informing Arant that she and her husband were giving their 30-day notice and would vacate the premises on May 11, 2008.

When defendant moved out, the condominium was not clean. Arant told defendant that she owed him $6,418 for past rent, late fees, and the cost to clean up the condominium. Arant offered to waive all remaining late fees if defendant paid him immediately what defendant owed him, approximately $4,500. Arant later changed his estimate to $1,806 without the late fees. Defendant believed she owed somewhere between $400 and $1,100, based on whatever time she had been in the residence during May and for any remaining late fees. When Arant confronted defendant about the amount owed, defendant disagreed with the amount and told Arant not to contact her again. Arant and defendant exchanged e-mails where Arant acknowledged an obvious disagreement in the amount owed and asked defendant to provide him with an accounting of what defendant believed she owed. The last contact Arant had with defendant was through e-mail, where defendant wrote:

> "We have contacted a lawyer on the subject, since there WAS A MOLD PROBLEM (which we have documented) & your illegal attempts at taking money for rent and applying it elsewhere as well as illegal 72 hour notice. You have more than enough money to cover the cleaning, as we cleaned tremendously when moving in (also documented) so I believe we are even. From now on it will be handled through the lawyer."

(Emphasis in original.)

A few months after defendant moved out, Arant could no longer reach defendant through e-mail or phone calls. Arant filed a police report, and defendant and her husband were subsequently charged with negotiating a bad check, ORS 165.065, and second-degree theft, ORS 164.045.[2] The state elected a theory of theft by deception, ORS 164.085.

---

[2] Defendant and her husband were tried separately.

A bench trial was held. Defendant testified that during the term of the lease, defendant had health problems that prevented her from going to work. She also testified that her husband had lost his job and the couple had difficulty paying other bills. Her car was repossessed and her utilities were shut off. At the close of the state's case, defendant moved for a judgment of acquittal based on the state's failure to provide evidence showing intent to defraud. The trial court denied the motion. The trial court found defendant not guilty as to Count 1, negotiating a bad check, but found her guilty of second-degree theft by deception. The court concluded that defendant formed the intent to deceive at the very end of the lease agreement when she told Arant that she did not owe him anything and he should not contact her again for whatever reason. The trial court explained:

> "The defense's argument is that she intended—she always intended to pay what she intended to pay and was going to sit back and wait for some lawsuit to come along.

> "However, [Arant] has testified to the following; that is, [defendant] said to him: We don't owe you anything; and then don't communicate with us again under any fashion. And I find his testimony on that matter to be more credible than hers.

> "I find that intent to deceive accrued at the very end of this lease agreement at the point in time, which she was leaving. I believe by her testimony, it was sufficient value. I find that the City has met its burden on Count 2 beyond a reasonable doubt. I, therefore, enter a finding of guilty on the charge of Theft in the Second Degree."

On appeal, defendant argues that the trial court erred by denying her motion for a judgment of acquittal because there was insufficient evidence for the court to infer that defendant intended to defraud Arant under ORS 164.085(1). According to defendant, ORS 164.085(3) prevents the factfinder from inferring defendant's intent not to perform her promise from lack of performance alone. Instead, defendant contends that the state must prove that, at the time of defendant's promise to Arant, she consciously tried to trick or deceive Arant. The state first argues that defendant failed to preserve her argument on appeal that the state's evidence was insufficient because it consisted only of evidence of

nonperformance. The state next contends that, even if the issue was preserved, the trial court properly denied the motion for a judgment of acquittal because there was sufficient evidence from defendant's repeated promises to pay rent—and then failing to pay—to infer intent.

We begin with an explanation of the relevant statute. In interpreting statutes, this court's task is to ascertain the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We first look at the text and context of the statute, and will consider legislative history if it appears useful to the court's analysis. *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009).

In part, ORS 164.085 provides:

"(1) A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:

"* * * * *

"(e) Promises performance that the person does not intend to perform or knows will not be performed.

"* * * * *

"(3) In a prosecution for theft by deception, the defendant's intention or belief that a promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed."

Thus, theft by deception requires (1) a person to obtain property from another, (2) by promising performance that the person intends or knows will not be performed, (3) with the intent to defraud. The parties do not dispute that defendant obtained property from Arant in the form of possession of the condominium. Both parties also agree that defendant made promises to Arant to pay rent during the tenancy. The only remaining issues are whether there was sufficient proof that defendant did not intend to perform as promised, or knew that she would not do so, and whether defendant had the intent to defraud. Although defendant appears to conflate the intent to defraud with the intent not to perform, which are two distinct elements for theft by

deception, we agree with defendant that the evidence was insufficient to establish the requisite intent to defraud.[3]

"Intent," when used with respect to conduct describing an offense, means "that a person acts with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7). The legislature did not define "defraud." When no statutory definition exists, we presume that the legislature intended terms to have their plain, natural, and ordinary meaning. *PGE*, 317 Or at 611. The plain meaning of "defraud" suggests an act of misrepresentation. Common definitions of "defraud" are "to take or withhold from (one) some possession, right, or interest by calculated misstatement or perversion of truth, trickery, or other deception," *Webster's Third New Int'l Dictionary* 593 (unabridged ed 2002), or "[t]o cause injury or loss to (a person) by deceit." *Black's Law Dictionary* 488 (9th ed 2009). Both definitions require misrepresentation or deception by the person taking the property or causing injury. Thus, we conclude that, as used in ORS 164.085, "intent to defraud" means that a person acts with a conscious objective to take property from another person by deception.[4]

Our case law supports that statutory construction. In *State v. Van De Vorren*, 94 Or App 694, 767 P2d 96 (1989), the defendant entered into a lease with the victims by promising to pay the rent with proceeds from assets that he sold in Belgium. He also induced the victims to loan him money by representing that he expected to inherit money from his father's estate. On appeal, the defendant argued that there was insufficient evidence for a rational jury to conclude that the defendant committed theft by deception. *Id.* at 697. We disagreed, concluding that conviction for theft by deception was supported by the defendant's repeatedly deceiving the

---

[3] Because we find insufficient evidence for a reasonable factfinder to infer an intent to defraud, we do not reach the state's contention that defendant failed to preserve her argument that, contrary to ORS 164.085(3), the trial court inferred defendant's intent not to perform from lack of performance alone.

[4] In the context of identity theft, ORS 165.800(1), we have concluded that "intent to defraud" includes "an intent to cause injury to another's legal rights or interests." *State v. Alvarez-Amador*, 235 Or App 402, 407, 232 P3d 989 (2010) (footnote omitted). In the context of theft by deception, ORS 164.085(1) limits the type of intended injury; it applies when a person acts with the intent to defraud and "obtains property of another thereby."

victims about his intention to repay them with his Belgian assets and expected inheritance. *Id.* at 697 n 4. The defendant's intent to defraud could be inferred by his deceptive statements that he would pay the victims from assets and money that he did not have.

In this case, the trial court inferred that defendant formed the intent to defraud at the end of the lease. At that time, defendant and Arant disagreed about the amount due. Arant believed that defendant owed anywhere from $1,400 to $6,400, while defendant believed she owed an amount between $400 and $1,100. The trial court appears to have inferred defendant's intent to defraud from defendant's statement that she and her husband did not owe anything to Arant and that he should never contact her again. That statement was insufficient as a matter of law to support the conviction.

First, even if defendant's statement was deceptive,[5] it did not establish an intent to defraud coupled with a promise. Theft by deception requires a person to obtain property from another by promising performance with the intent to defraud. ORS 164.085. Declaring her refusal to pay what Arant believed he was owed was not promising performance, and certainly was not a promise that would induce Arant to give up property. Without the promise element, defendant did not have an intent to defraud and did not commit theft by deception at the end of the tenancy.

---

[5] The scant evidence of deception appears to be that defendant acknowledged at the time of trial that, in her estimation, she still owed Arant between $400 and $1,100. The record otherwise contradicted the trial court's finding. Both Arant's and defendant's testimony and the documentary evidence indicated that defendant and Arant were in a dispute regarding the amount owed and that she was refusing to pay the amount Arant demanded. One of the state's exhibits, an e-mail that defendant sent to Arant, detailed defendant's belief that Arant had unlawfully credited her monthly rent payments to late fees first, thereby continually increasing the late fees that Arant charged her and her husband due to resulting shortfalls in rent. Defendant also asserted in the e-mail that the cleaning expense should have been reduced because of the condition of the unit when she moved in and the mold problem she had while living there. Finally, defendant told Arant in the e-mail, "[f]rom now on [this dispute] will be handled through the lawyer." Those statements in the e-mail, sent well before the criminal action began, do not suggest an intent to defraud, but instead a good faith dispute over the amount defendant and her husband actually owed.

Second, defendant's statement does not prove that she had an intent to defraud for previous promises she made during the term of the lease. Defendant's intent to defraud must be formed at the time defendant made her promise. The record does not indicate that, at the time she made her past promises, she had the requisite intent to defraud. Telling Arant, at the time the lease ended, that she did not owe him more in the context of a rent dispute is substantially different from having the intent not to pay at the time the promise is first made. Here, defendant explained to Arant that she disagreed with the amount due and would not pay on that basis. There was no indication that her statement meant she never intended to pay when she first signed the lease, which is consistent with the trial court's finding that defendant formed an intent to deceive at the end of the lease, when she was leaving. Therefore, defendant's statement was not proof of an intent to defraud at the time she made her past promises to pay rent.

In the alternative, the state argues that defendant's intent to defraud can be inferred by her repeated promises to pay her rent and her failure to do so. Based on the record, however, defendant made two explicit promises. First, she promised to pay rents for all months when she signed the lease in May 2007. Second, she promised in January that she "would do [her] best to get on track as quickly as possible." However, unlike in *Van De Vorren*, defendant engaged in no deceit, and she made no assertions about her *ability* to pay. In fact, she made the opposite assertion. When defendant signed the lease, she told Arant that she did not have enough money for the security deposit, so she and Arant agreed to pay the security deposit in installment payments from June through September. In the fall, she told Arant that her husband had lost his job and she had become ill, preventing her from working. If anything, defendant represented to Arant that she might not be able to perform her promise to pay rent. And unlike the defendant in *Van De Vorren*, defendant in this case made regular, albeit late, rental payments. From January 2007, when she promised to do her best to get back on track, defendant appears to have performed as promised for the three months following her promise: She paid her February rent on time and paid an additional $800 at the end

of February; she paid her March rent late but included an additional $355; and she paid her April rent on time. The only remaining rent definitively not accounted for is the partial May 2008 rent.[6] At the times when defendant made her promises—when she signed the lease in May and when she promised to get back on track in January—there was no evidence that she was engaging in deception. Although she ultimately failed to fully perform and a dispute ensued as to how much she owed Arant at the time she and her husband moved out, there was no evidence that would allow a reasonable factfinder to infer that she had a conscious objective to take Arant's property by deception at the time of her promises to him. Thus, viewing the facts most favorably to the state, there were insufficient facts to infer intent to defraud. The trial court erred in denying defendant's motion for judgment of acquittal.

Reversed.

---

[6] Arant did not provide a clear accounting of what he is owed.