Argued and submitted May 31, 2016, reversed and remanded July 19, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RANDY GRAY,
*Defendant-Appellant.*

Linn County Circuit Court
11081487; A156613

401 P3d 1241

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Randy Gray filed the supplemental brief *pro se.*

. Michael S. Shin, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F.

Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Tookey, Presiding Judge, and DeHoog, Judge, and Sercombe, Senior Judge.*

---

* Tookey, P. J., *vice* Hadlock, C. J.

## DEHOOG, J.

Defendant, a financial advisor, persuaded a number of his clients to invest in a stalled housing development that he knew to be deeply in debt. He did not fully disclose the project's financial condition and stated that their investments would be used for construction and earn them a substantial return; instead, the money went to existing creditors, to defendant, and to his associates. Construction did not resume, and defendant's clients—now alleged to be his victims—recovered only a fraction of their money. In defendant's view, however, he had merely recruited investors for a promising-but-indebted construction project, only to see a sound business venture doomed to failure by the unexpected collapse of the housing market.

A jury rejected defendant's view and found him guilty of 16 counts of aggravated theft in the first degree, ORS 164.057,[1] based on a theory of theft by deception. *See* ORS 164.015(4); ORS 164.085. Defendant appeals those convictions and raises three assignments of error.[2] We write to discuss only defendant's first and third assignments of error.[3] Defendant's first assignment of error challenges the denial of his motion for judgment of acquittal on statute of limitations grounds and argues that, under a proper construction of the theft statutes, the alleged thefts were completed

---

[1] As relevant here, theft, defined in ORS 164.015, constitutes theft in the first degree, ORS 164.055, when the value of the property taken is at least $1,000, and aggravated theft in the first degree, ORS 164.057, when that value is $10,000 or more.

[2] Defendant raises three additional assignments of error *pro se*, two of which we do not consider because they are unpreserved. As to the third, defendant argues that the trial court erred when it denied his motion to set aside the indictment. The trial court ruled that the motion was untimely and that, "even if timely," the motion failed on the merits. Defendant addresses only the merits of the court's ruling; we therefore conclude that defendant's challenge is barred because he "failed to assign error to one of two independent and alternative grounds on which the trial court ruled." *Strawn v. Farmers Ins. Co.*, 350 Or 521, 527, 256 P3d 100 (2011).

[3] In defendant's second assignment of error, he contends that the trial court plainly erred in failing to grant a judgment of acquittal *sua sponte*, because the evidence was insufficient to prove that he acted with the requisite mental states for theft by deception, namely, "intent to deprive another of property or to appropriate property," ORS 164.015, and "intent to defraud," ORS 164.085(1). We conclude, however, that the trial court did not plainly err, and reject that assignment without further discussion.

more than three years before the commencement of his prosecution.[4] In his third assignment of error, defendant argues that the trial court erred in excluding evidence that he had partially repaid and offered other assistance to several of his former clients, conduct that defendant contends would have been probative of his lack of criminal intent. As we explain below, we conclude that defendant did not preserve his first assignment of error, and we therefore decline to review it. On defendant's third assignment of error, however, we conclude that the trial court erred in excluding defendant's evidence and that its error was not harmless. We therefore reverse and remand.

We take the following facts from the evidence presented at defendant's trial. In mid-2008, defendant met a previously successful homebuilder, Derek Dunmyer. Through his construction company, Dunmyer had started a new housing development project, but had exhausted all available cash and credit before completing the project. At the time, Dunmyer's company was approximately $7 million in debt and was delinquent on multiple credit obligations, including debts owed to private investors who held liens on the development property. Dunmyer personally owed an additional $3 million in debts that included past-due income taxes and mortgage payments.

Defendant and his business partner, Scott Whitney, spoke with Dunmyer and determined that the development project could be completed profitably if they could raise $3.5 million in additional capital. Accordingly, defendant and Whitney agreed to form a management company, MTC, through which they would raise the necessary money and oversee the project. In exchange for those services, MTC would receive $100,000 immediately and earn as much as $1 million over five years. As part of their plan, defendant prepared a cash flow assessment indicating that the project would remain "very feasible," even if the housing market were to experience a moderate decline. Defendant and Whitney knew that Dunmyer had a history of neglecting

---

[4] It is undisputed that the relevant statute of limitations for aggravated theft in the first degree is three years, see ORS 131.125(8)(a), and that the state was required to commence prosecution for that offense no later than three years after its commission.

his financial obligations and of commingling corporate and personal assets. Thus, to ensure the success of the venture, they required Dunmyer to agree that MTC would retain control of the money and would use it primarily to pay off existing debts so that the development could move forward.

Defendant and Whitney separately owned and operated an investment advisory firm, Zurcrowner, and agreed that defendant would approach a number of their clients and recommend that they invest in Dunmyer's development project. Defendant told each client he approached essentially the same thing: Their money would finance a successful home-builder and be used to obtain land and build homes. Their investment would earn 12 percent annual interest and be paid back in full in five years, except for those investors who opted instead to receive monthly payments over a five-year period. Most of the victims recalled being assured that they would have a security interest in the development property and that defendant and Whitney would retain control of the money. Several victims remembered being told that Dunmyer and his construction company would be involved, but only two remembered hearing that some of the money would be used to restructure existing debt. For his part, defendant testified that he had told his clients about the general financial condition of the project and the plans to pay down existing debt; he acknowledged, however, that he did not disclose that some of his clients' money would go directly to MTC, or that any of the money would go to pay Dunmyer's delinquent taxes.

In July and August 2008, defendant's clients signed documents authorizing the proposed investments and executed wire orders directing that funds be transferred out of their existing investment accounts. The last such document was signed on August 19, 2008, but none of the wire orders were submitted until August 26, and no actual transfer of funds occurred until August 29. In accordance with MTC and Dunmyer's agreement, those funds were used to pay down existing debts, to satisfy Dunmyer's tax obligations, and to clear a lien against the development property. MTC also received the agreed-upon initial payment of $100,000, with $50,000 going directly to defendant. Although MTC directed those transactions, Dunmyer subsequently gained

independent control of the funds that he had agreed to let MTC manage. As a result, Dunmyer was able to pocket the proceeds from the sale of one house, as well as money that had been specifically earmarked to pay contractors. When the economy collapsed shortly thereafter, the development project failed, with no additional houses having been built. Defendant eventually acknowledged to his clients that the development company was in default and advised them that they had the option of foreclosing on the property. They ultimately did so, in a largely unsuccessful effort to recover their investments.

Five clients who had chosen to receive monthly interest payments testified that they had received at least four payments following the transfer of their funds to MTC. One of the clients acknowledged that, after receiving those initial four payments from the bank administering the loans, he continued to receive checks from one of defendant's companies for some undetermined time. Another of those clients testified that she received monthly payments for considerably longer than four months, and perhaps until as late as July 2011, but she did not identify the source of those payments.

As a result of the failed investment scheme, a grand jury indicted defendant and Whitney on August 25, 2011, on allegations of theft, racketeering, and unregistered sales of securities.[5] In relevant part, the indictment charged 16 substantially identical counts of aggravated theft in the first degree, as follows:

"AGGRAVATED THEFT IN THE FIRST DEGREE
ORS 164.015(1),(4)/164.057(1)(b)/164.085(1)(a)(b) (F/B)

"The Defendants, Scott Whitney and Randy Gray, on or about August 29, 2008, in Linn County, Oregon, did unlawfully and knowingly commit theft of money, of a total value of $50,000 or more, the property of [a named victim]."

Although the indictment appears to have charged defendant alternatively under ORS 164.015(1) ("[t]akes, appropriates, obtains or withholds such property") and ORS 164.015(4)

---

[5] The trial court granted defendant's motions for judgment of acquittal on the racketeering and securities charges at the close of the state's case.

("[c]ommits theft by deception as provided in ORS 164.085"),[6] the state proceeded at trial only on a theft by deception theory.

In defendant's first assignment of error, he contends that the trial court erred in denying his motion for judgment of acquittal because the statute of limitations had lapsed before prosecution commenced on August 25, 2011. As noted, the statute of limitations for aggravated first-degree theft is three years, ORS 131.125(8)(a),[7] and "starts to run on the day after the offense is committed," ORS 131.145(1). On appeal, defendant argues that any theft that he may have committed was committed within the meaning of ORS 131.145(1) when his clients authorized the use of their money and signed the corresponding wire orders. Because the last of defendant's clients to sign those documents did so on August 19, 2008, defendant contends that any resultant theft was "complete" more than three years before the commencement of prosecution on August 25, 2011. The state responds that the issue is unpreserved, because defendant did not argue at trial that he had completed his thefts before August 25, 2008. Instead, when defendant argued for a judgment of acquittal, the parties and the court all shared

_____

[6] ORS 164.015 provides, in part:

"A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person:

"(1) Takes, appropriates, obtains or withholds such property from an owner thereof; [or]

"* * * * *

"(4) Commits theft by deception as provided in ORS 164.085[.]"

ORS 164.085 provides, in part:

"(1) A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:

"(a) Creates or confirms another's false impression of law, value, intention or other state of mind that the actor does not believe to be true; [or]

"(b) Fails to correct a false impression that the person previously created or confirmed[.]

"* * * * *

"(2) 'Deception' does not include falsity as to matters having no pecuniary significance, or representations unlikely to deceive ordinary persons in the group addressed."

[7] Subsequent to the events of this case, the statute of limitations for aggravated first-degree theft was increased to six years if the victim is 65 years of age or older. *See* Or Laws 2012, ch 70, § 2.

the understanding that the offenses had been committed on August 29, 2008, the date that the funds actually left the victims' investment accounts. And, as the state notes, the focus of defendant's argument at that time was that the state had produced no evidence showing that he had personally engaged in any conduct on that date—or any other date within the limitations period—that contributed to the thefts that occurred on August 29.

We typically will not review a claim of error on appeal "unless the claim of error was preserved in the lower court * * *." ORAP 5.45(1). We evaluate whether an issue is adequately preserved in light of the underlying purposes of the preservation rule—"to allow the trial court to consider a contention and correct any error, to allow the opposing party an opportunity to respond to a contention, and to foster a full development of the record." *State v. Clemente-Perez*, 357 Or 745, 752, 359 P3d 232 (2015) (citing *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008)). In practical terms, a party's argument to the trial court must be "specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Further, the presence of a "common thread" between an objection at trial and an argument on appeal does not satisfy the preservation requirement if the two arguments are "qualitatively different." *See State v. Gaines*, 275 Or App 736, 744, 365 P3d 1103 (2015) (quoting *State v. Blasingame*, 267 Or App 686, 691, 341 P3d 182 (2014), *rev den*, 357 Or 299 (2015) (argument that defendant could not be convicted for robbery on an aid-and-abet theory because he did not threaten the use of physical force, ORS 164.395(1), did not preserve argument that defendant could not be convicted on an aid-and-abet theory because his conduct was "necessarily incidental," ORS 161.165(2), to the robbery as charged)).

Here, although defendant argued to the trial court that the statute of limitations had lapsed, he focused his argument on whether the evidence was sufficient to show "that [he had] acted within three years of August 25, [2011]." Specifically, defendant argued that his communications with Whitney and Dunmyer after August 25, 2008, could not

have contributed to the alleged theft, because they were not shared with his clients, and because his clients had already decided to authorize the investments before August 25.[8]

We conclude that defendant's first assignment of error is unpreserved, despite the "common thread" that defendant's arguments at trial and on appeal are both based upon the statute of limitations. At trial, defendant argued, as a factual matter, that he had not after August 25, 2008, engaged in conduct that contributed to the commission of crimes that allegedly occurred on August 29, 2008. Now defendant argues that, as a legal matter, any thefts that may have occurred were completed no later than August 19, 2008, when the last of the documents were signed. Those arguments are qualitatively different. Defendant's fact-based argument at trial would not have put the state on notice that it must confront the legal argument that the statute of limitations started running on August 19, 2008, nor would it have given the trial court an opportunity to consider that legal question. *See State v. Lockridge*, 282 Or App 414, 418-19, 386 P3d 96 (2016). Under those circumstances, the purposes of preservation have not been served, and we will not review the claimed error. *See Clemente-Perez*, 357 Or at 752.

Turning to defendant's third assignment of error, he contends that the trial court erred in excluding evidence of his actions following the transfer of funds out of the victims' accounts on August 29, 2008. Specifically, defendant argued unsuccessfully at trial that he should be able to introduce evidence that, after Dunmyer defaulted on the payments to those victims who had chosen to receive monthly payments, defendant continued to make the payments himself. The trial court also prevented defendant from eliciting testimony that he had offered to help the

---

[8] Defendant also argued that, although Whitney had submitted the wire orders on August 26, 2008, defendant could not be convicted as an accomplice because there was no evidence that Whitney "was acting on [defendant's] direction or behalf" when he did so. The court denied defendant's motion for judgment of acquittal, stating, "[T]here is certainly, if nothing else, circumstantial evidence that actions of which [defendant] had involvement, either directly or by aiders and abettors, a jury could determine that that was sufficient to find that the acts occurred within the statute of limitations."

victims develop and sell the land in order to recover their losses. Although defendant did not make a formal offer of proof, the "substance of the evidence * * * was apparent from the context" of defendant's argument. *See* OEC 103(1)(b). Moreover, in a post-trial filing, defendant indicated that he had made payments totaling $161,920 from January 2009 until July 2011, when he "was ordered to have no contact with the lenders." Defendant argues that the evidence was "relevant to whether he possessed the requisite intent at the time the theft occurred," because it suggested that defendant never intended to defraud or to deprive the victims of their property. The state responds that defendant's evidence is irrelevant because it is neither probative of defendant's intent at the time he obtained the money, nor material to the theft charges, because defendant's ostensible intent to repay his victims after-the-fact has no bearing on whether he committed theft in the first instance, when he obtained their money through deception.

Defendant's evidence first came to light when the state moved *in limine* to exclude evidence of repayment as irrelevant.[9] At the hearing on that motion, defendant and the state seemed to agree that evidence that defendant had tried to comply with the terms of the loans "might be relevant to whether or not [defendant] committed the crimes of fraudulently taking people's money," but that other forms of repayment or restitution would not be relevant. Nonetheless, the trial court ultimately ruled that the evidence "was not relevant legally nor factually," reasoning that the evidence was "kind of like going to the store and stealing candy—or taking a candy bar, taking it home and then trying to pay for it later on."

We review the court's determination of relevance for errors of law. *State v. Serrano*, 355 Or 172, 191, 324 P3d 1274 (2014), *cert den*, ___ US ___, 135 S Ct 2861 (2015). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

---

[9] The motion also suggested that, even if relevant, the court should exclude the evidence under OEC 403 because it would "lengthen the trial and confound the jury," but the state did not pursue that argument further at trial or on appeal.

without the evidence." OEC 401. Defendant's proffered evidence is relevant if it could support any permissible inference, however slight, that he lacked the intent to defraud or to deprive at the time of the theft.[10] *See State v. Salas-Juarez*, 349 Or 419, 427-28, 245 P3d 113 (2010). Evidence is relevant "'so long as the inference desired by the proponent is reasonable, even if the evidence could also support a contradictory inference.'" *State v. Hanson*, 280 Or App 196, 205, 380 P3d 1136, *rev den*, 360 Or 751 (2016) (quoting *Serrano*, 355 Or at 191). For the reasons that follow, we conclude that defendant's evidence was probative of his intent to defraud and that the court erred in ruling otherwise. That conclusion renders it unnecessary to further consider whether it was also relevant to defendant's intent to deprive another of property.

As an initial matter, we disagree with the state's contention that defendant's conduct after the date of the alleged crime is necessarily irrelevant to his intent at the time of the crime. We have previously deemed evidence of after-the-fact conduct to be probative of an earlier state of mind, including intent. *See State v. Christine*, 193 Or App 800, 810-11, 93 P3d 82, *rev den*, 337 Or 476 (2004) (considering defendants' post-taking disposition of property as evidence of their earlier "intent to deprive"); *see also, e.g., Hope Presbyterian v. Presbyterian Church (USA)*, 352 Or 668, 690, 291 P3d 711 (2012) (explaining that, with regard to a trust, the parties' conduct after its creation may be probative of the grantor's intent at the time of making the conveyance); *State v. Moriarty*, 87 Or App 465, 468 n 1, 742 P2d 704, *rev den*, 304 Or 547 (1987) ("Even though actions *after* the commission of a crime cannot alone constitute aiding or abetting, they may be used as evidence that earlier activities were aiding and abetting." (Emphasis in original; citations omitted.)).

---

[10] ORS 164.085(1) requires the "intent to defraud," and ORS 164.015 requires the "intent to deprive another of property or to appropriate property to the person or to a third person." Under the state's theory of the case, a conviction required the jury to find that, "with intent to defraud and to deprive another of property," defendant "obtained the property" of the victims "by creating another's false impression of law, value, intention, or other state of mind that the defendant does not believe to be true or by failing to correct a false impression that he previously created or confirmed." *See* ORS 164.085(1)(a), (b).

Further, we disagree that the evidence was irrelevant simply because it did nothing to show "that the information defendant provided to the victims was full and accurate" or "that defendant himself was mistaken about the scheme." As used in ORS 164.085, "intent to defraud" means "that a person acts with a conscious objective to take property from another person by deception." *State v. Reynolds*, 246 Or App 152, 159, 265 P3d 22 (2011). In essence, then, to "defraud" is to cheat others out of their rightful ownership. *See State v. Alvarez-Amador*, 235 Or App 402, 406-07, 232 P3d 989 (2010) (defining "defraud," in the identity-theft context, as "'[t]o cause injury or loss to (a person) by deceit'" (quoting *Black's Law Dictionary* 488 (9th ed 2009))); *McMullin v. Murphy*, 89 Or App 230, 233, 748 P2d 171, *rev den*, 305 Or 576 (1988) ("To establish intentional fraud, a plaintiff must prove, among other things, that the defendant made a false representation with knowledge of its falsity and with the purpose of or knowledge that he was misleading the [plaintiff].''). Accordingly, even though the fact that defendant provided incomplete information to the clients established that he had "[c]reat[ed] or confirm[ed] another's false impression of law, value, intention or other state of mind that the actor [did] not believe to be true," ORS 164.085(1)(a), that fact, alone, was not dispositive on the element of intent to defraud—*i.e.*, intent to cheat others out of their money.

Had defendant been allowed to introduce evidence of his efforts to repay and assist the victims, he could have argued to the jury that those actions demonstrated that his earlier misstatements or omissions resulted from inadvertence or a belief that his clients would not consider the omitted information significant, and that they did not reflect an intent to defraud. Given that defendant's evidence plausibly supported such an inference, the court erred when it ruled that the evidence was irrelevant.

Despite that conclusion, however, we must affirm defendant's conviction if there is "little likelihood" that the exclusion of the evidence affected the verdict. *See State v. Davis*, 336 Or 19, 32-33, 77 P3d 1111 (2003) (citing Or Const, Art VII (Amended), § 3). Our determination "is not a reflection of how we view the weight of the evidence of defendant's guilt, but rather a legal conclusion about the likely effect"

that the evidence would have had on the verdict. *State v. Schiller-Munneman*, 359 Or 808, 819, 377 P3d 554 (2016). Evidence that is "merely cumulative" and not "qualitatively different" from other, admitted evidence is less likely to have affected the verdict. *See Davis*, 336 Or at 34. However, if the excluded evidence "relates to a 'central factual issue' in the case, it is more likely to have affected the trier of fact's determination than if it deals with a tangential issue." *State v. Richards*, 263 Or App 280, 283, 328 P3d 710 (2014) (quoting *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009)). In assessing the likely effect of the evidence, "we will consider all pertinent evidence, not just evidence favorable to the state." *State v. Bement*, 284 Or App 276, 298, 391 P3d 838 (2017) (citing *State v. Blaylock*, 267 Or App 455, 456 n 1, 341 P3d 758 (2014), *rev den*, 357 Or 299 (2015)).

Here, the proffered evidence relates to a "central factual issue" in the case: whether defendant acted with the necessary intent to defraud. Defendant candidly acknowledges that, as the state argues, his after-the-fact efforts to make the victims whole could equally support two, contrary inferences—that he had a guilty conscience and that his intentions were pure. However, we are mindful not to put ourselves in the place of the jury, *see Schiller-Munneman*, 359 Or at 819, and we do not decide as a matter of law how the jury would have viewed that evidence.

Furthermore, the excluded evidence is qualitatively different from the other evidence of defendant's intent introduced at trial. For example, the court allowed defendant to present evidence, over the state's objection, about the feasibility of the project, ruling that it "goes to his state of mind." Specifically, defendant, Dunmyer, and Whitney all testified that they had believed that the project could succeed based on reasonable financial projections, and Dunmyer's accountant testified that those projections had used "valid numbers based on valid assumptions," which understandably had not predicted the subsequent housing market crash. Defendant's subsequent efforts to aid his clients after the venture failed would have corroborated that evidence that his intentions in seeking his clients' involvement had been good. Evidence of those efforts, therefore, was not "merely cumulative." *See Davis*, 336 Or at 34. Nor did the victims' oblique references

to defendant's payments or his post-default contact with them render his proffered evidence cumulative. *See* 286 Or App at 804. Because the trial court ruled that defendant's evidence was irrelevant, it deprived him of the opportunity to identify himself as the source of those payments or to argue that his conduct was probative of his lack of intent to defraud. Had the court ruled otherwise, defendant would have been permitted to introduce evidence that he had personally made payments of more than $160,000 to his former clients, well more than the $50,000 that he had obtained from the venture. The jury may well have considered that strong evidence that defendant had not intended to defraud the victims in the first place. Under those circumstances, we cannot conclude that there is little likelihood that the verdict would have been different had that evidence been admitted, and the court's error was therefore not harmless.

Reversed and remanded.